# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF VIRGINIA
### ALEXANDRIA DIVISION

| | |
|---|---|
| ATTILA BIBER, individually and on behalf of all others similarly situated,<br><br>               Plaintiff,<br><br>     vs.<br><br>PIONEER CREDIT RECOVERY, INC.,<br><br>Defendant. | E.D. Virginia Case No. 16-CV-804 (TSE) |
| ATTILA BIBER and SANDRA LEVY, individually and on behalf of all others similarly situated,<br><br>               Plaintiff,<br><br>     vs.<br><br>GENERAL REVENUE CORPORATION,<br><br>Defendant. | E.D. Virginia Case No. 17-CV-205 (TSE) |
| SARA KOZAK, formerly known as SARA LEMKE and SARA AZZALINE, individually and on behalf of all others similarly situated,<br><br>               Plaintiff,<br><br>     vs.<br><br>PIONEER CREDIT RECOVERY, INC.,<br><br>Defendant. | N.D. Illinois Case No. 17-CV-318 |

PLAINTIFFS, ATTILLA BIBER, SANDRA LEVY, AND SARA KOZAK, Individually, And On Behalf Of the Class,

Thomas R Breeden
Thomas R. Breeden, P.C.
10326 Lomond Drive
Manassas, VA 20109
Tel: (703) 361-9277 (x201)

Dale W. Pittman
The Law Office of Dale W. Pittman, PC
The Eliza Spotswood House
112-A West Tabb Street
Petersburg, VA 23803
Tel: (804) 861-6000

Brian L. Bromberg
Bromberg Law Office, P.C.
Standard Oil Building
26 Broadway, 21st Floor
New York, NY 10004
Tel: (212) 248-7906

Daniel A. Edelman
Cathleen M. Combs
Edelman, Combs,
Latturner & Goodwin, LLC
20 South Clark Street, Suite 1500
Chicago, IL 60603
(312) 739-4200

# Table of Contents

Table of Authorities.................................................................................................................ii

Introduction and Class Member Response to the Notice of Settlement...................................1

**I.      Background and Summary of Settlement** ..................................................................4

**II.     Factors Bearing on Final Approval** ........................................................................10

**III.    The Notice was Reasonable and the Best Practicable**.............................................11

**IV.     The Settlement is Fair, Reasonable, and Adequate** ...............................................13

    **A.      Fairness**........................................................................................................................13

    **B.      Adequacy**.....................................................................................................................15

**V.      The few objections raised by Class Members are without merit, and in any event, most were not validly submitted in the manner directed by the Court** .......................................................16

**VI.     Award to representative Plaintiffs** .........................................................................19

**VII.    *Cy Pres* Award** ..........................................................................................................20

**VIII.   The attorney fees and costs sought by Plaintiffs on behalf of the class, which represent approximately 33-1/3% of the total settlement fund, is fair and reasonable** .................................20

    **A.      In awarding fees and costs, Courts should bear in mind Congress' goals in mandating fee-shifting under the FDCPA** .......................................................................................................21

    **B.      FDCPA fee standards** .................................................................................................22

    **C.      The proposed fee is reasonable** ..................................................................................22

    **D.      Plaintiffs' attorneys' hourly rates are reasonable**.....................................................28

    **E.      Attorney fees incurred in connection with the fee petition are recoverable.**...................30

    **F.      An upward adjustment should be made** .......................................................................30

        **1. The time and labor required.**........................................................................................32

        **2. The novelty and difficulty of the questions.**.................................................................33

        **3. The skill requisite to perform the legal services properly.**...........................................34

        **4. The preclusion of other employment.**...........................................................................34

        **5. The customary fee for like work in the community.**.......................................................35

        **6. Whether the fee is fixed or contingent.**.........................................................................35

        **7. Time limitations imposed by the client or the circumstances.**......................................37

        **8. The amount involved and the results obtained.**............................................................37

        **9. The experience, reputation and ability of the attorney.**................................................38

        **10. The undesirability of the case.**....................................................................................39

        **11. The nature and length of the professional relationship with the client.**......................39

        **12. Awards in similar cases.**.............................................................................................39

Conclusion...............................................................................................................................40

## Table of Authorities

**Page(s)**

**Cases**

*In re Abrams & Abrams, P.A.*,
    605 F.3d 238 (4th Cir. 2010) ........................................................................36, 37

*Algie v. RCA Global Commc'ns, Inc.*,
    891 F. Supp. 875 (S.D.N.Y. 1994) ........................................................................27

*Alvarado Partners, L.P. v. Mehta*,
    723 F. Supp. 540 (D. Colo. 1989) ........................................................................16

*Amchem Products, Inc. v. Windsor*,
    521 U.S. 591 (1997) ........................................................................20

*In re Ampicillin Antitrust Litig.*,
    526 F. Supp. 494 (D.D.C. 1981) ........................................................................24

*Bailey v. District of Columbia*,
    839 F. Supp. 888 (D.D.C. 1993) ........................................................................26, 33

*In re Bankcorp. Litig.*,
    291 F.3d 1035 (8th Cir. 2002) ........................................................................24

*Bankston v. State of Illinois*,
    60 F.3d 1249 (7th Cir. 1995) ........................................................................26

*Beech Cinema, Inc. v. Twentieth Century Fox Film Corp.*,
    480 F. Supp. 1195 (S.D.N.Y. 1979) ........................................................................24

*In re Beverly Hills Fire Litig.*,
    639 F.Supp. 915 (E.D.Ky, 1986) ........................................................................31

*Biber v. Pioneer*
    Action ........................................................................4, 5, 14

*Biber v. Pioneer Credit Recovery, Inc.*,
    229 F.Supp.3d 457 (E.D. Virginia 2017) ........................................................................5

*Biber v. Pioneer Credit Recovery, Inc.*,
    E.D. Virginia Case No. 16-CV-804 (TSE) ........................................................................4, 5

ii

*Blum v. Stenson*,
    465 U.S. 886 (1984)................................................................26, 27, 35

*Bradford v. HABS Mortg. Corp.*,
    859 F. Supp. 2d 783 - 91 (E.D. Virginia 2012) ................................25

*Brinker v. Giuffrida*,
    798 F.2d 661 (3d Cir. 1986)................................................................30

*Cardiology Associates, P.C. v. National Intergroup Inc.*,
    1987 WL 7030 (S.D.N.Y. 1989)..........................................................16

*Carroll v. Wolpoff & Abramson*,
    53 F.3d 626 (4th. Cir. 1995) ...............................................................22

*In re Cenco Inc. Sec. Litig.*,
    519 F.Supp. 322 (N.D.Ill. 1981) .........................................................31

*In re Cendent Corp. PRIDES Litig.*,
    243 F.3d 722 (3d Cir. 2001)................................................................31

*Chambless v Masters Mate & Masters Pension Plan*,
    885 F.2d 1053 (2d 1989)................................................................27, 28

*City of Greenville v. Syngenta Corp Prot., Inc.*,
    904 F. Supp. 2d 902 (S.D. Ill. 2012) ..................................................24

*Cohen v. West Haven Bd. of Police Com'rs*,
    638 F.2d 496 (2d Cir. 1980)................................................................26

*In re Combustion, Inc.*,
    968 F. Supp. 1116 (W.D. La. 1997).....................................................24

*Matter of Cont'l Ill. Sec. Litig.*,
    962 F.2d 566 (7th Cir. 1992) ...............................................................24

*Daly v. Hill*,
    790 F.2d 1071 (4th Cir. 1986) .......................................................26, 30

*Dashiell v. Van Ru Credit Corp.*,
    E.D.Va. No. 12-cv-273-AJT-TRJ .......................................................14

*David v. City of Scranton*,
    633 F.2d 676 (3d Cir. 1980)................................................................30

*De Jesus v. Banco Popular de Puerto Rico*,
    918 F.2d 232 (1st Cir. 1990)................................................................22

*Depaoli v. Vacation Sales Assocs., L.L.C.*,
    489 F.3d 615 (4th Cir. 2007) ............................................................29

*DiFilippo v. Morizio*,
    759 F.2d 231 (2d Cir. 1985)................................................26, 28, 34

*Ellis v. General Revenue Corp.*,
    D. Conn. No. 09-cv-1089-VLB ........................................................14

*Emanuel v. American Credit Exchange*,
    870 F.2d 805 (2d Cir. 1989)..............................................................22

*Fisher v. Va. Elec. & Power Co.*,
    217 F.R.D. 201 (E.D. Va. 2003) ......................................................12

*Florin v. Nationsbank of Ga., N.A.*,
    34 F.3d 560 (7th Cir. 1994) ..............................................................23

*Gary v. Kason Credit Corp.*,
    No. 95-CV-54 (D. Conn. Oct. 21, 1998) ..........................................27

*Gaskill v. Gordon*,
    942 F. Supp. 382 (N.D. Ill. 1996), *aff'd*, 160 F.3d 361 (7th Cir. 1998) ................................24

*Gates v. Deukmejian*,
    987 F.2d 1392 (9th Cir. 1992) ..........................................................30

*Goldberger v. Integrated Resources, Inc.*,
    209 F.3d 43 (2d Cir. 2000)..........................................................23, 25

*Graziano v. Harrison*,
    950 F.2d 107 (3d Cir. 1991)..............................................................22

*Greene v. Emersons Ltd.*,
    No. 76 Civ. 2178 (CSH), 1987 WL 11558 (S.D.N.Y. May 20, 1987) ................................24

*Grisson v. The Mills Corp.*,
    549 F.3d 313 (4th Cir. 2008) ............................................................25

*Haitian Refugee Center v. Meese*,
    791 F.2d 1489 (11th Cir. 1986) ........................................................30

iv

*Henley v. FMC Corp.*,
    207 F. Supp. 2d 489 (S.D. W. Va. 2002) ...............................................................11

*Hensley v. Eckerhart*,
    461 U.S. 424, 103 S.Ct. (1983) ............................................................................26

*In re Heritage Bond Litig.*,
    No. 02-ML-1475, 2005 WL 1594403 (C.D. Cal. June 10, 2005) ...........................24

*Hymes v. Harnett County Bd. of Ed.*,
    664 F.2d 410 (4th Cir. 1981) ................................................................................30

*In re Jiffy Lube Secs. Litig.*,
    927 F.2d 155 (4th Cir. 1991) ....................................................................13, 15, 16

*Johnson v. Georgia Hwy. Exp., Inc.*,
    488 F.2d 714 (5th Cir. 1974), abrogated on other grounds by *Blanchard v.*
    *Bergeron*, 489 U.S. 87 (1989) ....................................................................... *passim*

*Johnson v. State of Miss.*,
    606 F.2d 635 (5th Cir. 1979) ...............................................................................30

*Kerns v. Consolidated Coal Company*,
    247 F.3d 131 (4th Cir. 2001) ...............................................................................30

*Lemire v. Wolpoff & Abramson, P.C.*,
    D. Conn., Docket No. 08-cv-249(CSH) ................................................................35

*Linsley v. FMS Investment Corp.*,
    D. Conn. No. 11-cv-961-VLB ...............................................................................14

*In re M.D.C. Holdings Sec. Litig.*,
    No. CV89-0090 E (M), 1990 WL 454747 (S.D. Cal. Aug.30, 1990) ....................24

*Maley v. Del Global Technologies Corp.*,
    186 F.Supp.2d 358 (S.D.N.Y. 2002) ....................................................................23

*Martin v. United Auto Credit Corp.*,
    3:05-cv-00143 (E.D. Va. Aug. 29, 2006) (Final Order approving class notice
    with approximately 85% delivery) ...........................................................................9

*McDonald v. Pension Plan of the NYSA-ILA Pension Trust Fund*,
    450 F.3d 91 (2d Cir. 2006) ..................................................................................28

*McGowan v. King, Inc.*,
    661 F.2d 48 (5th Cir. 1981) .................................................................................32

*In re Mego Fin. Corp. Sec. Litig.*,
213 F.3d 454 (9th Cir. 2000) ............................................................24

*In re Microstrategy, Inc.*,
172 F. Supp. 2d 778 (E.D. Virginia 2001) .............................................23

*In re MicroStrategy, Inc. Sec. Litig.*,
148 F. Supp. 2d 654 (E.D. Va. 2001) ....................................................11, 13, 16

*In re Mid-Atlantic Toyota Antitrust Litig.*,
564 F. Supp. 1379 (D. Md. 1983) .........................................................13

*Miele v. New York State Teamsters Conference Pension & Retirement Fund*,
831 F.2d 407 (2d Cir. 1987) .................................................................27

*Missouri v. Jenkins by Agyei*,
491 U.S. 274 (1989) ...........................................................................26

*Morgan v. Credit Adjustment Board*,
1998 U.S. Dist. Lexis 8135 ..................................................................33

*New England Carpenters Health Benefits Fund v. First Databank, Inc.*,
No. 05-11148, 2009 WL 2408560 (D. Mass. Aug. 3, 2009) ....................31

*Nigh v Koons Buick Pontiac GMC Incorporated*,
478 F.3d 183 (4th Cir. 2007) ...............................................................30

*Perdue v. Kenny A. ex rel. Winn*,
559 U.S. 542, 130 S.Ct. 1662, 176 L.Ed.2d 494 (2010) ........................25, 32

*Phillips Petroleum Co. v. Shutts*,
472 U.S. 797 (1985) .............................................................................9

*Pipiles v. Credit Bureau of Lockport*,
886 F.2d 22 (2d Cir. 1989) ..................................................................22

*Plyler v. Evatt*,
902 F.2d 273 (4th Cir. 1990) ...............................................................29

*Randle v. H&P Capital*,
513 Fed. Appx 282 (4th Cir. 2013) (unpublished opinion) .....................22

*Rum Creek Coal Sales, Inc. v Caperton*,
31 F.3d 169 (4th Cir. 1994) .................................................................29

*San Francisco NAACP v. San Francisco Unified Sch. Dist.*,
  59 F. Supp. 2d 1021 (N.D. Cal. 1999) .................................................................................11

*Savoie v. Merchants Bank*,
  166 F.3d 456 (2d Cir.1999)...................................................................................................23

*In re Serzone*,
  231 F.R.D. 221 (S.D. W. Va. 2005)........................................................................................9

*Silverman v. Motorola Solutions, Inc.*,
  739 F.3d 956 (7th Cir. 2013) ................................................................................................24

*South Carolina Nat'l Bank v. Stone*,
  139 F.R.D. 335 (D.S.C. 1991) ..............................................................................................13

*Spellan v. Board of Educ. For Dist. 111*,
  69 F.3d 828 (7th Cir. 1995) ..................................................................................................30

*Strang v. JHM Mortg. Securities Ltd. Partnership*,
  890 F. Supp. 499 (E.D. Va. 1995) ........................................................................................13

*Sykes v Mel Harris and Associates, LLC*,
  No. 09-CV-8486, 2016 WL 3030156, . (S.D.N.Y. May 24, 2016) ................................15, 18

*Tolentino v. Friedman*,
  46 F.3d 645 (7th Cir. 1995) (George C. Pratt, C.J.)........................................................22, 40

*Trimper v. City of Norfolk, Va.*,
  846 F. Supp. 1295 (E.D. Va. 1994) ......................................................................................26

*In re Union Carbide Corp. Consumer Prods. Bus. Sec. Litig.*,
  724 F. Supp. 160 (S.D.N.Y. 1989) ..................................................................................24, 25

*United States Football League v. National Football League*,
  887 F.2d 408 (2d Cir. 1989)............................................................................................28, 30

*Van Gemert v. Boeing Co.*,
  516 F. Supp. 412 (S.D.N.Y. 1981) .......................................................................................24

*Vancouver Women's Health Collective Soc'y v. A.H. Robins Co., Inc.*,
  820 F.2d 1359 (4th Cir. 1987) ................................................................................................8

*Venes v. Professional Service Bureau, Inc.*,
  353 N.W.2d 671 (Minn. App. 1984)......................................................................................22

*Vizcaino v. Microsoft*,
290 F.3d 1043 (9th Cir. 2002) ...............................................................31

*Will v. Gen. Dynamics Corp.*,
Civil No. 06-698-GPM, 2010 WL 4818174 (S.D. Ill. Nov. 22, 2010)....................................24

*Withers v. Eveland*,
997 F. Supp. 738 (E.D. Virginia 1998)............................................................22, 33

*Yohay v. City of Alexandria Employees Credit Union*,
827 F.2d 967 (4th Cir. 1987) ...............................................................36

*Zagorski v. Midwest Billing Services, Inc.*,
128 F.3d 1164 (7th Cir. 1997) ...............................................................22, 40

**Statutes**

Truth in Lending Act, 15 U.S.C. § 1601, *et seq.* ...........................................................32

Fair Credit Reporting Act, 15 U.S.C. § 1681, *et seq.* ....................................................36

Fair Debt Collection Practices Act, 15 U.S.C. §1692, *et seq.* ............................................... *passim*

**Other Authorities**

Laura B. Bartell, *Taxation of Costs and Awards of Expenses in Federal Court* ..........................28

Alba Conte & Herbert Newberg, *Newberg on Class Actions* § 11.41 (4th ed. 2002) ...............................................................11

Fed. R. Civ. P. 12 ...............................................................32

Fed. R. Civ. P. 23 ............................................................... *passim*

**Introduction and Class Member Response to the Notice of Settlement**

Plaintiffs Attila Biber, Sandra Levy, and Sara Kozak, together with Class Counsel did an extraordinary job here. Not only did they help create important case law concerning the manner in which student loans can be collected and wages garnished using administrative proceedings, but with the assistance of a highly respected mediator – the Honorable Rosemarie Annunziata – they recovered more than five times the maximum statutory class-action recovery allowed under the Fair Debt Collection Practices Act. In an environment in which the tabloids castigate class-action litigants for recovering pennies, assuming approval, each of the 11,539 Class Members who submitted a valid claim form will receive a settlement check of approximately $170.70 (for those who certified that they were employed or seeking employment when they received that at-issue letter) or $85.35 (for those who did not).[1] In other words, the results obtained here are both rare and exceptional.

Accordingly, under Fed. R. Civ. P. 23, Plaintiffs move this Court for final approval of the proposed class action settlement. As explained below, notice has been provided to the Class Members in accordance with the Court's Preliminary Approval Order. Defendants have agreed to establish a Settlement Fund in the amount of $2.745 million, which will be divided on a *pro rata* basis among the Class Members who returned claim forms.

---

[1] These estimates are based on the assumption that the Court will grant Plaintiffs' request for $761,376.35 in attorney fees and costs, which is to be paid out of the settlement fund. If the Court were to grant a different award for attorney fees and costs, then the recovery for each Class Member who submitted a claim form would be different. These estimates are also based only on the claim forms currently deemed valid – as noted below, there are a handful of claim forms which the Court will have to determine whether to consider as valid. The final disbursements to class members will change if the Court determines some or all of the questionable claim forms to be valid.

A total of 11,539 Class Members timely returned valid claim forms.  There were also 366 claim forms that were postmarked after the November 21, 2017 deadline for submission; however, Class Counsel asks the Court to treat as having been timely submitted.[2]

Of the 11,539 timely returned claim forms, there were 1,095 claim forms with minor name changes. The parties have accepted and processed these forms.  It is reasonable to expect that many class members' student loans were incurred when they were in their late teens or early twenties.  Accordingly, subsequent name changes – through marriage or otherwise – are to be expected for a number of class members in this particular litigation. Two individuals lost or misplaced their claim forms and requested replacements after the deadline to submit. Unless the Court directs otherwise, the parties intend to treat these two individuals as not having submitted timely claim forms. If the Court, however, wishes the claims administrator to send out replacement claim forms and give a short period to these individuals to return the completed forms, the parties will follow the Court's directions.

A total of 83 Class Members left their signatures off their claim forms, rendering their claims technically invalid even though timely submitted.  In order to cure this deficiency, the parties sent "cure letters" that these 83 Class Members must sign and return to RUST (the settlement administrator) by January 4, 2018 – which is one day before the final approval hearing.  The parties have agreed to treat these claims as timely so long as the signed claim

---

[2] For their part, Defendants have no objection to this request.

forms are received by January 4, 2018.  This may increase the number of accepted claimants slightly by the final approval hearing.[3]

A total of 43 relatives of Class Members wrote in on behalf of deceased individuals to inquire whether they could receive funds as beneficiaries or distributees.  The parties have devised a cover letter and standardized affidavit to send to these individuals to fill out if they wish to claim settlement funds on behalf of the decedents' estate.[4] If the Court approves the form and sets a deadline, the parties will send the form out and report back on the results.

A total of 44 Class Members requested exclusion from the Class. An additional group of 12 people submitted what appear to be exclusion requests on their claim forms or just submitted claim forms and other documents that do not make it clear what they want to do. The parties agree that three of these forms constitute valid exclusion requests, six of these forms are neither claims nor exclusion requests, but rather, notification that the individual is deceased, in jail or of unknown location, and three of these forms do not give clear notice as to what the intention of the Class Members is. For the three that are unclear as to their intention, the parties seek the Court's guidance on how to handle these claims. One claim appears to be a notification from a class member's mother that the class member is deceased and that she is the administrator of the estate – it is unclear whether the mother is intending to make a claim on behalf of the estate. A

---

[3] Further, there were 35 Class Members who timely submitted signed claim forms but did not fill in some other portion of the claim form (*e.g.*, their current mailing address).  After reviewing the settlement agreement, preliminary approval order, and notice to the Class Members, the parties agree that these 35 claim forms are adequately completed for the purpose of receiving settlement funds under the agreement.

[4] A copy of the proposed form is affixed to the Declaration of Thomas R. Breeden as Exhibit 3

second unclear claim form is a lengthy submission which at times appears to be an objection, and at other times appears to be an exclusion request. The third unclear claim form states "I choose to not be add to lawsuit." It is unclear if this means that the class member wishes to opt out, or if he just does not wish to participate.[5]

Although nine Class Members sent letters to counsel and to the Court opposing the settlement, one of the letters was sent in late or were not sent in compliance with the requirements of the Court's preliminary approval order. More importantly, however, the objections have no merit. For example, the objections for the most part indicate that the individual objectors indicate that they have actual damages and wish they were receiving more money for the claims. However, there is a mechanism for these objectors to seek more money for their claims - they could have opted out of the settlement, and pursued their own claims.

If the settlement is approved and if Class Counsel is awarded the fees and costs requested, each Class Member who submitted a claim form will receive a payment in the amount of approximately $170.70 (for those who certified that they were employed or seeking employment when they received that at-issue letter) or $85.35 (for those who did not). This substantial recovery for the Class Members merits final approval of the settlement.

I.      **Background and Summary of Settlement**

On June 27, 2016, Biber filed *Biber v. Pioneer Credit Recovery, Inc.*, E.D. Virginia Case No. 16-CV-804 (TSE), on behalf of himself and a class of similarly situated individuals in the United States District Court for the Eastern District of Virginia (the "*Biber v. Pioneer* Action"),

---

[5]  The three unclear claim forms are attached to the Declaration of Thomas R. Breeden, attached hereto as Exhibits 4, 5 and 6

alleging violations of the Fair Debt Collection Practices Act ("FDCPA"), 15 U.S.C. §1692 *et seq.* In the *Biber v. Pioneer* Action, Plaintiff alleged that Defendant Pioneer violated the FDCPA by sending pre-garnishment letters that failed to give the pre-garnishment notices and warnings required under federal law. Plaintiff Biber alleged that these actions violated sections of the FDCPA and most of these claims survived a motion to dismiss under Fed. R. Civ. P. 12(b)(6).

In the original *Biber v. Pioneer* action, the parties engaged in full discovery, while simultaneously briefing Pioneer's motion to dismiss under Fed. R. Civ. P. 12(b)(6).  Discovery was completed shortly before the parties argued the motion to dismiss. Soon thereafter, on January 11, 2017, the Court held that Biber stated a claim for relief under the FDCPA.[6]

While the parties were litigating the *Biber v. Pioneer* case, General Revenue Corporation, sent an identical letter to Mr. Biber, seeking to collect the same debt.[7]  Mr. Biber's attorneys also learned that Sandra Levy, a client of Dale Pittman, Esq., had received the same letter from GRC. Accordingly, Mr. Biber and Ms. Levy filed a case against GRC, entitled *Biber and Levy v. GRC*. The case has been transferred to the Honorable T.S. Ellis, III, the same judge to whom the *Biber v. Pioneer* case has been assigned. Meanwhile, in the Northern District of Illinois, Kozak filed a separate suit for the same letters on behalf of consumers residing in the states in the Seventh Circuit.

After fully briefing the motion for class certification on *Biber v. Pioneer*, the parties agreed to a nationwide settlement the night before oral argument. When Brian L. Bromberg, Esq., appeared in court the following morning, the Honorable T.S. Ellis, III, asked that the

---

[6] *Biber v. Pioneer Credit Recovery, Inc.*, 229 F.Supp.3d 457 (E.D. Virginia 2017).
[7] Pioneer and General Revenue Corporation are both indirect subsidiaries of Navient Corporation.

settlement documents be filed expeditiously and asked that Mr. Bromberg advise the parties that he thought the class definition set forth in the motion papers was overbroad and needed to be limited to those who had jobs or were seeking jobs when the collection letters at issue were sent. With that in mind, the parties created a settlement claim form and notice that asked the class members whether they were employed or seeking employment during the two-year period before the sending of the settlement notices. Any class member who answered in the affirmative would receive twice the settlement funds of any class member who did not check the applicable box. Any class member who failed to timely return the claim form would not receive any compensation.

The final result of the settlement discussions was memorialized in a Class Action Settlement Agreement and Release (the "Agreement"), which is on file as ECF# 85-5. Essentially, after extensive arm's-length negotiations, the parties agreed to a nationwide class settlement for 217,815 class members for $2.745 million, which represents more than five times the $500,000 statutory damages maximum available to a class under the FDPCA.

From this settlement fund, the parties agreed to deduct the cost of class notice and administration, the individual awards to the Class Representatives, and attorney fees and costs for Class Counsel. The administrative costs of settlement are estimated to reach approximately $280,000, but under no circumstances will more than $280,000 be deducted from the $2.745 million settlement fund to cover settlement administration. Any unused portion of this $280,000 will remain with the Settlement Class. The settlement agreement permits class counsel to request fees of up to one third of the total settlement, as a common fund settlement.  This fee request would be $900,000.  Plaintiff's counsel have incurred time charges in prosecuting this case in an

amount not less than $500,483.70, and costs in the amount of $10,650.80.  In light of the extensive amount of time and effort devoted to this case, counsel believes the full $900,000 attorney fees authorized under the settlement are justifiable; however, in order to maximize the recovery for the class, but still reward counsel for the hard fought and cutting-edge nature of this case, Plaintiff's counsel would instead seek a modest multiplier of 1.5 times the lodestar fees, or $750,725.55, and costs of $10,650.80.

Class Counsel is thus petitioning for attorney fees substantially less than the maximum amount authorized under the Agreement. The individual awards to the Class Representatives are based on their degrees of involvement in litigating and negotiating the three cases: payment of $12,500 to Plaintiff Biber, $10,000 to Plaintiff Levy, and $5,000 to Plaintiff Kozak for the settlement of their individual claims.

The remaining balance shall be distributed to each of the Settlement Class members who timely return a claim form. [8]Those Settlement Class members who certify that they were working or seeking work when they received the Letter will receive twice the settlement amount of those who Settlement Class members who do not check the box. Thus, assuming an award of attorney fees and costs of $761,376.35, the 8,099 class members who certified that they were working or seeking work shall receive $170.70 each, while the remaining 3,440 class members shall receive $85.35 each.

Under Fed. R. Civ. P. 23(e), Plaintiffs – with Defendants' consent and for settlement purposes only – moved for class certification and preliminary approval of the proposed class

---

[8] Stinehart Declaration at ¶20.

7

action settlement. Specifically, Plaintiffs requested that the Court certify the following proposed class:

> All natural persons in the United States of America who are similarly situated to the Plaintiffs in that: (a) Pioneer sent them a letter in a form substantially similar or materially identical to Exhibit A or Exhibit B between June 27, 2015, and continuing to the date that an order is entered certifying this class; or (b) GRC sent them a letter in a form substantially similar or materially identical to Exhibit C or Exhibit D between February 22, 2016, and continuing to the date that an order is entered certifying this class.

On July 24, 2017, the Court granted preliminary approval of the Settlement,[9] and on July 28, 2017, the Court amended the preliminary approval order and scheduled a Fairness Hearing for January 5, 2018.[10]

Due process, in the class action context, requires that the form of notice be "reasonably certain to inform those affected."[11]  Here, the Parties agreed to a direct-mail notice program designed to reach all of the Class Members. Defendants, through Rust Consulting, Inc. – a class action administration company – distributed direct-mail notice to the Class Members using the last known physical addresses of those Class Members as reflected in Defendants' business records.[12] The class list provided to First Class identified 217,815 consumers to whom Defendants sent the same or similar collection letters at issue in this matter, and RUST removed any duplicate records within the class list. As detailed in the Declaration of Jason M. Stinehart,

---

[9] Dkt.93.
[10] Dkt.96.
[11] *Vancouver Women's Health Collective Soc'y v. A.H. Robins Co., Inc.*, 820 F.2d 1359, 1364 (4th Cir. 1987).
[12] *See* the Declaration of Jason M. Stinehart, which was filed by Defendants on RUST's behalf. Dkt. 125.

before mailing notice to the Class Members, Rust utilized the National Change of Address update process of the U.S. Postal Service to update the addresses in the class list.  Following these efforts, notice of the class action settlement was mailed to  217,815 Class Members in accordance with the Court's Preliminary Approval Order.[13]  Of the 217,815  notices mailed to Class Members, 5,395  notices were returned by the U.S. Postal Service with a new address and re-mailed,[14] and 29,248  were returned as undeliverable with no forwarding address.[15]  Further, replacement claim forms were mailed to approximately 41 Class Members, even though the parties had no express obligation to provide replacement claim forms under the Agreement.  Therefore, the direct mailing may be estimated to have reached approximately 188,534 of the 217,815 Class Members.  Moreover, on September 21, 2017 – the day before the Class Notices were mailed to the Class Members – RUST set up a toll-free telephone support line that Class Members could call to receive guidance regarding commonly asked questions.  [16]

The Supreme Court has concluded that direct notice satisfies due process.[17] And other courts – including courts within the Fourth Circuit – have approved mailed-notice programs that reached a comparable or even smaller percentage of class members than the Notice reached here.[18]

---

[13] _Stinehart Declaration at ¶8

[14]  According the Rust Declaration, at ¶9, Stinehart Consulting re-mailed 5,362 of the returned Notices.  The remaining 33 Notices were returned after the November 21, 2017 Claim Form deadline, and were therefore not re-mailed.

[15] Stinehart Declaration at ¶9, 10

[16]  Stinehart Decl. at ¶ 11.

[17] *Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 812-13 (1985).

[18] *See In re Serzone*, 231 F.R.D. 221, 236 (S.D. W. Va. 2005) (approving notice program where direct mail portion was estimated to have reached 80% of class members); *Martin v. United Auto Credit Corp.*, 3:05-cv-00143 (E.D. Va. Aug. 29, 2006) (Final Order approving class notice with approximately 85% delivery).

9

In sum, the Parties have complied fully with the Court's Preliminary Approval Order, and have taken reasonable steps to ensure that the Class Members were notified – in the best and most direct manner possible – of the Settlement's terms and benefits.

## II.    Factors Bearing on Final Approval

The Parties seek, under the terms of the Court's Preliminary Approval Order and federal law, final approval of the Settlement. The Settlement is the result of litigation, followed by lengthy settlement negotiations conducted at arm's length. Most significantly, the Settlement provides significant monetary benefit to the Class Members.

A class settlement, and subsequent dismissal of the case, requires Court approval.[19] The process for that approval is discussed generally in Rule 23(e), which provides, in relevant part:

(e) Settlement, Voluntary Dismissal, or Compromise.

The claims, issues, or defenses of a certified class may be settled, voluntarily dismissed, or compromised only with the court's approval. The following procedures apply to a proposed settlement, voluntary dismissal, or compromise:

(1) The court must direct notice in a reasonable manner to all class members who would be bound by the proposal.

(2) If the proposal would bind class members, the court may approve it only after a hearing and on finding that it is fair, reasonable, and adequate. . . .[20]

Rule 23(e) thus imposes two basic requirements on the parties and on the Court before the approval of a class settlement and dismissal. First, the Court must determine that notice was directed "in a reasonable manner to all class members."[21] Second, the Court must determine that

---

[19] Fed. R. Civ. P. 23(e)(1)(A).
[20] Fed. R. Civ. P. 23(e).
[21] Fed. R. Civ. P. 23(1).

the settlement "is fair, reasonable, and adequate."[22] Plaintiffs address these requirements *seriatim*.

Federal jurisprudence strongly favors resolution of class actions through settlement.[23] Federal Rule of Civil Procedure 23 requires Court review of the resolution of a class action such as this one. Specifically, the Rule provides that "[t]he claims, issues, or defenses of a certified class may be settled, voluntarily dismissed, or compromised only with the court's approval."[24] Court approval is required to ensure that the parties gave adequate consideration to the rights of absent class members during the settlement negotiations.[25] The Court may approve a settlement only after a hearing and on finding that it is "fair, reasonable, and adequate."[26] Approval of a class action settlement is committed to the "sound discretion of the district courts to appraise the reasonableness of particular class action settlements on a case-by-case basis, in light of the relevant circumstances."[27] Additionally, "there is a strong initial presumption that the compromise is fair and reasonable."[28]

## III.    The Notice was Reasonable and the Best Practicable

---

[22] Fed. R. Civ. P. 23(2).
[23] *San Francisco NAACP v. San Francisco Unified Sch. Dist.*, 59 F. Supp. 2d 1021, 1029 (N.D. Cal. 1999); *see also* Alba Conte & Herbert Newberg, *Newberg on Class Actions* § 11.41 (4th ed. 2002) ("The compromise of complex litigation is encouraged by the courts and favored by public policy.")
[24] Fed. R. Civ. P. 23(e).
[25] *Henley v. FMC Corp.*, 207 F. Supp. 2d 489, 492 (S.D. W. Va. 2002) (citing *In re Jiffy Lube Secs. Litig.*, 927 F.2d 155, 158 (4th Cir. 1991)).
[26] Fed. R. Civ. P. 23(e)(2).
[27] *In re MicroStrategy, Inc. Sec. Litig.*, 148 F. Supp. 2d 654, 663 (E.D. Va. 2001).
[28] *Id.* (quoting *South Carolina Nat'l Bank v. Stone*, 139 F.R.D. 335, 339 (D.S.C. 1991)).

In a settlement class maintained under Rule 23(b)(3), class notice must meet the requirements of both Federal Rules of Civil Procedure 23(c)(2) and 23(e). Rule 23(e) specifies that "[n]o class action may be 'dismissed or compromised without [court] approval,' preceded by notice to class members."[29] Rule 23(c)(2) requires that notice to the class must be "the best practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort."[30] The Rule also requires that the notice inform potential class members that (1) they have an opportunity to opt out; (2) the judgment will bind all class members who do not opt out or appear through counsel.[31] The Court must consider the mode of dissemination and the content of the notice to assess whether such notice was sufficient.[32]

As courts in this Circuit have held, "[w]hat amounts to reasonable efforts under the circumstances is for the Court to determine after examining the available information and possible identification methods . . . . 'In every case, reasonableness is a function of [the] anticipated results, costs, and amount involved.'"[33] The Parties' efforts to provide Class Members with Notice of the Class Action demonstrate clearly that they were the best notice practicable under the circumstances given: (a) the available information; (b) the possible identification methods; (c) the number of class members; (d) the amount of the settlement; (e) the value to the class as a whole by holding up the settlement process for the other class members; (f) the significant additional costs to class members; and (g) the anticipated results of

---

[29] Fed. R. Civ. P. 23(e).
[30] Fed. R. Civ. P. 23(c).
[31] *Id.*
[32] *See Manual for Complex Litigation* (Fourth) § 21.312 (2004).
[33] *Fisher v. Va. Elec. & Power Co.*, 217 F.R.D. 201, 227 (E.D. Va. 2003) (citations omitted).

12

further identification efforts. Thus, the Court should find that the Notice of the Class Action (and process followed as described above) satisfies Rule 23.

## IV.    The Settlement is Fair, Reasonable, and Adequate

The Court's determination of compliance with Rule 23(e)(1)(C) typically requires a two-part analysis. The Court must determine whether the settlement is "fair" and then whether the settlement is "adequate." The approval of a proposed settlement agreement is in the sound discretion of the Court.[34]

### A.    Fairness

The fairness factors pertain to whether there has been arm's-length bargaining.[35] The court must consider: (i) the posture of the case at the time of settlement; (ii) the extent of discovery that has been conducted; (iii) the circumstances surrounding the negotiations; and (iv) the experience of counsel.[36] A proposed class action settlement is considered presumptively fair where there is no evidence of collusion and the parties, through capable counsel, have engaged in arm's length negotiations.[37]

Due to the timing of the resolution in this case, sufficient information was exchanged between the Parties prior to the Settlement. Further, the case was founded upon FDCPA claims with which Plaintiffs' counsel was familiar, having prosecuted numerous similar matters against

---

[34] *In re Jiffy Lube Sec. Litig.*, 927 F.2d 155, 158 (4th Cir. 1991).

[35] *See In re Mid-Atlantic Toyota Antitrust Litig.*, 564 F. Supp. 1379, 1383 (D. Md. 1983); *South Carolina Nat'l Bank v. Stone*, 139 F.R.D. 335, 339 (D.S.C. 1991).

[36] *In re Jiffy Lube Securities Litig*, 927 F.2d 155, 158-59 (4th Cir. 1991); *see also In re MicroStrategy, Inc. Securities Litig.*, 148 F. Supp. 2d 654, 663-64 (E.D. Va. 2001); *Strang v. JHM Mortg. Securities Ltd. Partnership*, 890 F. Supp. 499, 501 (E.D. Va. 1995).

[37] *See South Carolina Nat'l Bank*, 139 F.R.D. at 339.

other defendants.[38]   The Parties fairly reached the Settlement after engaging, through counsel, in protracted formal discovery in the original *Biber v. Pioneer* Action to determine the class size and other key information needed to move for class certification or engage in settlement discussions.[39]   In addition, when the settlement was reached, Plaintiff Biber's motion for certification of a class against Pioneer was pending in the originally-filed *Biber v. Pioneer* Action, and Mr. Biber was prepared to proceed to trial.   Further, this nationwide settlement was reached only after the parties had engaged in a full day of mediation through a highly respected mediator – the Honorable Rosemarie Annunziata, a retired Virginia Court of Appeals Judge. Even though the cases did not settle during the actual mediation session, Judge Annunziata's assistance was beneficial to all parties involved.

Although Plaintiffs believe liability to be strong, Defendants deny liability.   If tried, Plaintiffs would bear the burden of establishing that Defendants' collection letter violated the FDCPA.   Defendants vigorously deny any wrongdoing, have asserted numerous defenses, and maintain that the letters that are the subject of this case comply in all respects with the FDCPA.

The settlement process itself was arm's-length and fair. Class counsel also satisfies the procedural fairness requirement of competent representation.   Class counsel has considerable experience in this field and has litigated or is currently litigating numerous class actions under the FDCPA.

---

[38] *See, e.g., Dashiell v. Van Ru Credit Corp.*, E.D.Va. No. 12-cv-273-AJT-TRJ ; *Ellis v. General Revenue Corp.*, D. Conn. No. 09-cv-1089-VLB; *Linsley v. FMS Investment Corp.*, D. Conn. No. 11-cv-961-VLB.

[39] As it relates to the action against GRC and the *Kozak v. Pioneer* action that was originally filed in the Northern District of Illinois, the parties engaged in informal discovery whereby Defendants revealed the size of those then-prospective classes.

Also contributing to the fairness analysis is the fact that the class has overwhelmingly supported the settlement.  Out of over 217,000 class members, only nine class members have objected, three additional class members have given notice of the intention to appear at the final hearing, and only 44 have filed exclusions requests (an additional five class members have submitted letters which counsel cannot classify, and which will be submitted to the Court for classification).  Thus, out of over 217,000 class members, 58 have voiced potential opposition to the settlement.  This is the equivalent of 0.03% of the total class opposing the settlement.  Courts can consider the lack of class member opposition in determining whether a class settlement should be approved.[40]

Finally, weighing most heavily in favor of approval is that a class recovery of $170.70 or $85.35 to each Class Member who sent in a proper claim form is one of the larger statutory damage recoveries that Class Counsel knows of in a class action brought under the FDCPA.[41] And Class Counsel have, between them, many years of practicing law and, more particularly, consumer law.[42]

**B.    Adequacy**

The Court must also determine whether the proposed class settlement is substantively "adequate."  The Fourth Circuit's decision in *Jiffy Lube* explained that the adequacy inquiry is guided by evaluating:

---

[40] *Sykes v Mel Harris and Associates, LLC*, No. 09-CV-8486, 2016 WL 3030156, at *12. (S.D.N.Y. May 24, 2016) (citing, *inter alia*, *Newberg on Class Actions* § 13:54 (5th ed.) ("[I]f only a small number of objections are received, that fact can be viewed as indicative of the adequacy of the settlement.")).
[41] *See* Bromberg Decl.
[42] *Id.*

(1) the relative strength of the plaintiffs' case on the merits, (2) the existence of any difficulties of proof or strong defenses the plaintiffs are likely to encounter if the case goes to trial, (3) the anticipated duration and expense of additional litigation, (4) the solvency of the defendants and the likelihood of recovery on a litigated judgment, and (5) the degree of opposition to the settlement.[43]

By its terms, the Settlement provides substantial consideration to the Class Members. The Settlement is therefore fair, reasonable, and an excellent result for the class. Additionally, the case was defended by opponents with considerable experience and prior success; and obtaining a jury determination that the alleged violation was significant enough to warrant maximum statutory damages would always remain a challenge for Plaintiffs in this case. "Thus, the old adage, 'a bird in hand is worth two in the bush' applies with particular force in this case."[44]

Finally, the Court must consider it an important statement that only a handful of Class Members have objected to the Settlement. The Settlement has to be seen as a significant success. "Such a lack of opposition to the partial settlement strongly supports a finding of adequacy, for 'the attitude of the members of the Class, as expressed directly or by failure to object, after notice to the settlement is a proper consideration for the trial court.'"[45]

## V.   The few objections raised by Class Members are without merit, and in any event, most were not validly submitted in the manner directed by the Court

---

[43] *In re Jiffy Lube*, 927 F.2d at 159.

[44] *Cardiology Associates, P.C. v. National Intergroup Inc.*, 1987 WL 7030, at *2 (S.D.N.Y. 1989) (concluding that because continued prosecution of the action would have been expensive and time-consuming, and would have involved substantial risks, "it [was] not unreasonable for the plaintiff class to take a 'bird in the hand'"); *see also Alvarado Partners, L.P. v. Mehta*, 723 F. Supp. 540, 547 (D. Colo. 1989) (noting that "[i]t has been held prudent to take 'a bird in the hand instead of a prospective flock in the bush'" in weighing the value of an immediate recovery against "the mere possibility of future relief after protracted and expensive litigation").

[45] *In re MicroStrategy, Inc. Securities Litig.*, 148 F. Supp. 2d 654, 667-68 (E.D. Va. 2001) (quoting *Flinn v. FMC Corp.*, 528 F.2d 1169, 1173 (4th Cir. 1975)).

16

Class Members occasionally file "objections" stating in essence that, in their view, their individual claims are not being adequately compensated by the settlement because of their particular circumstances. But the opt-out mechanism is specifically designed to accommodate such situations, in which the settlement is fair but may not adequately compensate a few uniquely situated Class Members.

Here, the objection letters received from Nina Caporale was untimely and should not be considered. Nevertheless, if the Court were to consider all of the objections, the letters break down into three basic categories: (1) incomprehensible objections, (2) claims that the individual objectors are not being adequately compensated and that it is Class Counsel's obligation to represent them individually in their pursuit of a larger individual settlement, and (3) individuals who feel that there should have been a higher return rate for the claim forms.

The incomprehensible objections include objections from Dale Sieber (ECF 98).

The claims that individual objectors are not being adequately compensated include the following:

Laura Goldberg (ECF 104). Ms. Goldberg is requesting actual damages for class members and objects to the amount of the per class member award, as well as to the attorney fees award.

Sean Kazi (ECF 100). Mr. Kazi objects to the amount of the per class member award, as well as to the attorney fees award.

Roderick Reed (ECF 110). Mr. Reed objects to the amount of the per class member award.

Adam Glover (ECF 103). Mr. Glover objects to the amount of per class member award.

17

Nina Caporale (ECF 118). Ms. Caporale explains her actual damages, and objects to the amount of per class member award.

Courts have routinely overruled objections from class members that the anticipated relief they will receive is not enough.[46]

There was also an objection complaining that the return rate for the claim forms was not sufficient. *See* objection of Lakendra Moore (ECF 114). Ms. Moore does not describe how she would guarantee that a greater number of class members would respond to a different manner of class notice. The return rate of 5.52% is well within the range of customary return rates for claim form classes.[47]

In addition, there are five notices that may or may not be objections. These include the following notices:

- Julia Wilhelm (ECF # 108) – This letter appears to a recitation of wrongs Ms. Wilhelm is claiming she suffered at the hands of GC Services. She does not appear to be asking for an exclusion or objecting to the settlement.

- Barbara Williams (ECF # 107) – This letter appears to be a recitation of problems Ms. Williams has incurred related to the underlying debt, and does not appear to be a request for exclusion or an objection to the settlement.

- Lisa Davis (attached to Breeden Declaration as Exhibit 4). Ms. Davis provides a lengthy recitation, but does not indicate whether she is objecting to the settlement or seeking to exclude herself from the class.

- Anthon Ortalano (attached to Breeden Declaration as Exhibit 5). Mr. Ortalano indicates that he "choose not to be add to lawsuit", but does not specify if he wishes to exclude his claim from the class or just not receive funds.

- Corey Wardlow (attached Breeden Declaration as Exhibit6). Mr. Wardlow is deceased. His mother has written and indicated that she is the administrator of the

---

[46] *Sykes*, 2016 WL 3030156 at * 19.
[47] *See* accompanying Declaration of Brian Bromberg.

estate.  She asks to remove him from the lawsuit, but it is unclear if she realizes that she may be able to make a claim for the estate for Mr. Wardlow's share.

In sum, the letters from these objectors do not raise any proper objections to a class settlement – in fact, their alleged claims are precisely the reason Congress requires that putative class members be given an opportunity to opt out of any class-action settlement under Rule 23(b)(3).

## VI.    Award to representative Plaintiffs

Plaintiffs request, and Defendants have agreed not to object to, personal awards of $12,500 to Plaintiff Biber, $10,000 to Plaintiff Levy, and $5,000 to Plaintiff Kozak for the settlement of their individual claims and in recognition of their services as the Class Representative.  These awards are warranted because of the Class Representatives' involvement in this case and commitment to following up with counsel to assure that they were actively prosecuting this case.  In addition, Plaintiff Biber was actively involved not only in filing and litigating this case, but in appearing for a full-day deposition and in spending time with counsel negotiating the settlement.[48]  Although she was not deposed, Ms. Levy also spent time with counsel negotiating the settlement.[49] Mr. Kozak's more limited involvement is reflected in the lesser award the parties negotiated for him.  Most importantly, however, the awards are, in part, to compensate Plaintiffs for their individual claims against Defendants.  In sum, Plaintiffs have been model class representatives, and such awards are both reasonable and of the type commonly approved.[50]

---

[48] *See* Biber Declaration, dated April 24, 2017, at ECF# 68-4.
[49] *See* Levy Declaration, dated July 10, 2017, at ECF#85-7.
[50] *See* Bromberg Decl.

## VII.   *Cy Pres* Award

Any funds from settlement checks un-cashed (*i.e.*, checks not cashed within 90 days of the date on which they were mailed to Class Members) or other undistributed funds shall be awarded to the Posse Veterans Program – Posse Foundation, Inc., for the purpose of the Scholars program as the *cy pres* recipient, subject to the Court's approval.

## VIII.   **The attorney fees and costs sought by Plaintiffs on behalf of the class, which represent approximately 33-1/3% of the total settlement fund, is fair and reasonable**

Plaintiff, on behalf of the class, seeks an agreed-upon recovery of up to $761,376.35 for attorney fees and costs.  Further, after the parties had agreed on the total amount to be placed in the settlement fund, Defendants agreed not to oppose Plaintiffs' request of up to $915,000 for attorney fees and costs.[51]

Under *Amchem Products, Inc. v. Windsor*,[52] the Court must ensure that the payment is fair and reasonable.[53]  Congress enacted the FDCPA more than three decades ago because of "abundant evidence of the use of abusive, deceptive, and unfair debt collection practices" that harm the marketplace economy by "contribut[ing] to the number of personal bankruptcies, to marital instability, to the loss of jobs, and to invasion of individual privacy."[54] Congress found

---

[51] Dkt. 85-5 at 13, § III(H) ("Defendants shall not object to such motion for fees and costs. However, nothing herein limits Defendants' ability and obligation to respond with candor to any inquiry that the Court may make regarding Class Counsel's motion for attorneys' fees and costs.").

[52] *Amchem Products, Inc. v. Windsor*, 521 U.S. 591 (1997).

[53] Further, the parties' Agreement provides: "Court approval of attorneys' fees and costs, or their amount, will not be a condition of the Settlement.  The Agreement shall be effective and binding irrespective of the amount awarded by the Court to Class Counsel for attorneys' fees and costs." Dkt. 85-5 at 14, § III(I).

[54] 15 U.S.C. § 1692(a).

that existing laws and procedures were "inadequate to protect consumers" and "means other than misrepresentation or other abusive debt collection techniques are available for the effective collection of debts."[55] Congress encouraged consumers to bring FDCPA actions before Federal Article III judges by eliminating any "amount in controversy" requirement.[56] Congress also fostered enforcement of the FDCPA by enacting statutory damages and mandating that debt collectors pay "reasonable attorney's fees as determined by the court."[57]

### A.  In awarding fees and costs, Courts should bear in mind Congress' goals in mandating fee-shifting under the FDCPA

Congress enacted the FDCPA more than three decades ago because of "abundant evidence of the use of abusive, deceptive, and unfair debt collection practices" that harm the marketplace economy by "contribut[ing] to the number of personal bankruptcies, to marital instability, to the loss of jobs, and to invasion of individual privacy."[58] Congress found that existing laws and procedures were "inadequate to protect consumers" and "means other than misrepresentation or other abusive debt collection techniques are available for the effective collection of debts."[59] Congress encouraged consumers to bring FDCPA actions before Federal Article III judges by eliminating any "amount in controversy" requirement.[60] Congress also fostered enforcement of the FDCPA by enacting statutory damages and mandating that debt collectors pay "reasonable attorney's fees as determined by the court."[61]

---

[55] 15 U.S.C. § 1692(b) and (c).
[56] 15 U.S.C. § 1692k(d).
[57] 15 U.S.C. § 1692k(a)(3).
[58] 15 U.S.C. § 1692(a).
[59] 15 U.S.C. § 1692(b) and (c).
[60] 15 U.S.C. § 1692k(d).
[61] 15 U.S.C. § 1692k(a)(3).

**B. FDCPA fee standards**

Where, as here, an attorney fees provision is phrased in mandatory terms,[62] "fees may be denied a successful plaintiff only in the most unusual of circumstances."[63] An award of fees is mandatory in FDCPA cases.[64] Fees are mandatory even if there has been no award of actual or statutory damages.[65] Civil suits will deter abusive practices only if it is economically feasible for consumers to bring them. "Unless consumers can recover attorney's fees, it may not be possible for them to pursue small claims. . . . Congress recognized this problem and specifically provided for the award of attorney fees to successful plaintiffs."[66]

**C. The proposed fee is reasonable**

Where a party brings a private action resulting in a large fund for the benefit of a class, courts frequently examine the reasonableness of the fee not just on the basis of a lodestar analysis, but also on a percentage basis. That is, courts use two methods to calculate attorney

---

[62] 15 U.S.C. § 1692k(a)(3) ("[I]n the case of any successful action to enforce the foregoing liability, [any debt collector who fails to comply with any provision of this subchapter with respect to any person is liable to such person in an amount equal to the sum of] the costs of the action, together with a reasonable attorney's fee as determined by the court.")

[63] *De Jesus v. Banco Popular de Puerto Rico*, 918 F.2d 232, 234 (1st Cir. 1990) (truth in lending).

[64] *Randle v. H&P Capital*, 513 Fed. Appx 282 (4th Cir. 2013) (unpublished opinion) ("*See* 15 U.S.C. § 1692k(a)(3) (mandating the payment of reasonable attorney fees and costs to a successful consumer under the FDCPA)"); *Carroll v. Wolpoff & Abramson*, 53 F.3d 626, 628 (4th. Cir. 1995) ("the fee award under § 1692k is mandatory in all but the most unusual circumstances…"); *Zagorski v. Midwest Billing Services, Inc.*, 128 F.3d 1164 (7th Cir. 1997); *Tolentino v. Friedman*, 46 F.3d 645, 651 (7th Cir. 1995) (George C. Pratt, C.J.); *Graziano v. Harrison*, 950 F.2d 107, 113-14 (3d Cir. 1991) (FDCPA "mandates an award of attorney's fees as a means of fulfilling Congress's intent that the Act should be enforced by debtors acting as private attorneys general"); *Withers v. Eveland*, 997 F. Supp. 738, 739 (E.D. Virginia 1998).

[65] *Emanuel v. American Credit Exchange*, 870 F.2d 805, 808 (2d Cir. 1989); *Pipiles v. Credit Bureau of Lockport*, 886 F.2d 22, 28 (2d Cir. 1989).

[66] *Venes v. Professional Service Bureau, Inc.*, 353 N.W.2d 671 (Minn. App. 1984).

fees in such cases: (1) the percentage method, which awards attorney fees as a percentage of the common fund created for the benefit of the class, and (2) the lodestar/multiplier approach, which multiplies the number of hours expended by counsel by the hourly rate normally charged for similar work by attorneys of comparable skill and experience, and enhances the resulting lodestar figure by an appropriate multiplier to reflect litigation risk, the complexity of the issues, the contingent nature of the engagement, the skill of the attorneys, and other factors.[67]

As Your Honor has observed:

> The percentage-of-recovery method does not depend on counsels' hourly rates or billable hours; it is, instead, based on a percentage of the common fund, with the precise percentage selected by the trial court with reference to essentially the same case-specific factors used to adjust, or determine a multiplier for, a lodestar figure. *See Goldberger v. Integrated Res., Inc.*, 209 F.3d 43, 47 (2d Cir. 2000). This methodology is less cumbersome to apply than the lodestar computation, and it has the virtue of reducing the incentive for plaintiffs' attorneys to over-litigate or "churn" cases, particularly those cases with a high probability of success. Understandably, the trend in securities class actions and other common fund cases has been toward use of the percentage method. Indeed, in recent years, two circuits have mandated, and seven circuits have explicitly approved, the use of the percentage-of-recovery approach in common fund cases.[68]

Other courts have observed "there are advantages to utilizing the percentage method in common fund cases because of its relative simplicity of administration."[69]

> The percentage method is bereft of largely judgmental and timewasting computations of lodestars and multipliers. These latter

---

[67] See *Goldberger v. Integrated Resources, Inc.*, 209 F.3d 43, 50 (2d Cir. 2000); *Savoie v. Merchants Bank*, 166 F.3d 456, 460 (2d Cir.1999); *Maley v. Del Global Technologies Corp.*, 186 F.Supp.2d 358, 369–70 (S.D.N.Y. 2002).

[68] *In re Microstrategy, Inc.*, 172 F. Supp. 2d 778, 786-87 (E.D. Virginia 2001) (footnotes omitted).

[69] *Florin v. Nationsbank of Ga., N.A.*, 34 F.3d 560, 566 (7th Cir. 1994).

computations, no matter how conscientious, often seem to take on the character of so much Mumbo Jumbo. They do not guarantee a more fair result or a more expeditious disposition of litigation.[70]

If one were to think of the recovery as a common fund class action, then 33-1/3% of $2.745 million is at the market price and therefore reasonable, as reflected in the fees approved by other courts.[71]

But no matter which method is chosen—percentage or lodestar/multiplier—the fees

---

[70] *In re Union Carbide Corp. Consumer Prods. Bus. Sec. Litig.*, 724 F. Supp. 160, 170 (S.D.N.Y. 1989); *see also Matter of Cont'l Ill. Sec. Litig.*, 962 F.2d 566, 573 (7th Cir. 1992) (noting it is easier to establish market based percentages than to "hassle over every item or category of hours and expense and what multiple to fix and so forth"); *Gaskill v. Gordon*, 942 F. Supp. 382, 386 (N.D. Ill. 1996) ("[T]he percentage of fund method provides a more effective way of determining whether the hours expended were reasonable."), *aff'd*, 160 F.3d 361 (7th Cir. 1998).
[71] *Silverman v. Motorola Solutions, Inc.*, 739 F.3d 956 (7th Cir. 2013) (approving a fee of 27.5% of $200 million common fund and noting that another court had approved a fee of 30% for the first $10 million of a common fund); *City of Greenville v. Syngenta Corp Prot., Inc.*, 904 F. Supp. 2d 902, 908–09 (S.D. Ill. 2012) (approving a one-third fee because a "contingent fee of one-third of any recovery after the reimbursement of costs and expenses reflects the market price" and citing cases); *Will v. Gen. Dynamics Corp.*, Civil No. 06-698-GPM, 2010 WL 4818174, *3 (S.D. Ill. Nov. 22, 2010) (finding "the market rate for complex plaintiffs' attorney work in this case and similar cases is a contingency fee" and agreeing "a one-third fee is consistent with the market rate"); *In re Heritage Bond Litig.*, No. 02-ML-1475, 2005 WL 1594403, *19 (C.D. Cal. June 10, 2005) (awarding class counsel's fee request of 33% of the common fund); *In re Bankcorp. Litig.*, 291 F.3d 1035, 1038 (8th Cir. 2002) (affirming award of 36% of the settlement fund); *In re Mego Fin. Corp. Sec. Litig.*, 213 F.3d 454, 460 (9th Cir. 2000) (affirming award of attorney fees equal to 33.33% of the total recovery); *In re M.D.C. Holdings Sec. Litig.*, No. CV89-0090 E (M), 1990 WL 454747, *1, *10 (S.D. Cal. Aug.30, 1990) (awarding attorney fees equal to 30% of the settlement fund plus expenses); *Greene v. Emersons Ltd.*, No. 76 Civ. 2178 (CSH), 1987 WL 11558, *8 (S.D.N.Y. May 20, 1987) (awarding attorney fees and expenses in excess of 46% of the settlement fund); *In re Combustion, Inc.*, 968 F. Supp. 1116, 1131–32 (W.D. La. 1997) (awarding attorney fees equal to 36% of the common fund); *In re Ampicillin Antitrust Litig.*, 526 F. Supp. 494, 503 (D.D.C. 1981) (awarding attorney fees in excess of 40% of the settlement fund); *Beech Cinema, Inc. v. Twentieth Century Fox Film Corp.*, 480 F. Supp. 1195, 1198–99 (S.D.N.Y. 1979) (awarding attorney fees in excess of 50% of the settlement fund); *Van Gemert v. Boeing Co.*, 516 F. Supp. 412, 420 (S.D.N.Y. 1981) (awarding attorney fees of 36% of settlement fund).

awarded in common fund cases must be "reasonable" under the circumstances.[72] In

*Goldberger*,[73] a leading case that has been cited with approval by Judge Ellis, the Second Circuit

instructed that in exercising discretion to approve an award in attorney fees, a district court

"should continue to be guided by the traditional criteria in determining a reasonable common

fund fee, including: (1) the time and labor expended by counsel; (2) the magnitude and

complexities of the litigation; (3) the risk of the litigation ...; (4) the quality of representation; (5)

the requested fee in relation to the settlement; and (6) public policy considerations."[74] In

applying these criteria, "a Court essentially makes no more than a qualitative assessment of a fair

legal fee under all the circumstances of the case."[75]

Unsurprisingly, the six *Goldberger* criteria, applied in common fund situations, are

remarkably similar to the 12 *Johnson* factors used in this Circuit to calculate a "presumptively

reasonable fee" when petitioning for fees under a lodestar analysis.[76] The *Johnson* factors[77] are:

(1) the time and labor required; (2) the novelty and difficulty of the questions; (3) the skill

requisite to perform the legal services properly; (4) the preclusion of other employment by the

attorney due to acceptance of the case; (5) the customary fee in the community; (6) whether the

---

[72] *Goldberger*, 209 F.3d at 47.

[73] *Id.*, at 43.

[74] *Id.* at 50 (citation omitted, ellipses in original).

[75] *Union Carbide*, 724 F.Supp. at 166.

[76] *Grisson v. The Mills Corp.*, 549 F.3d 313, 320-21 (4th Cir. 2008) (adopting the *Johnson* factors);

[77] While it is true that there has been some debate in this Circuit as to whether the *Johnson* factors should still be applied after the Supreme Court's decision in *Perdue v. Kenny A. ex rel. Winn*, 559 U.S. 542, 130 S.Ct. 1662, 176 L.Ed.2d 494 (2010), Your Honor, in *Bradford v. HABS Mortg. Corp.*, 859 F. Supp. 2d 783, 789 - 91 (E.D. Virginia 2012), described *Perdue* as having "clarified and, at least by implication, revised the procedure that must be followed to determine a reasonable fee award."

fee is fixed or contingent; (7) time limitations imposed by the client or the circumstances; (8) the amount of time involved and the results obtained; (9) the experience, reputation, and ability of the attorneys; (10) the "undesirability" of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases.[78]

There is no strict formula as to how these factors are applied.[79] Once a figure for attorney fees is calculated using the *Johnson* factors, that amount becomes the "lodestar" which can then be adjusted upwards or downwards, again using the *Johnson* factors.[80] "[M]any of those factors usually are subsumed within the initial calculation of hours reasonably expended at a reasonable hourly rate."[81] If the lodestar figure is properly calculated, adjustment will be unnecessary in most cases.[82] There is a strong presumption that the lodestar figure (reasonable hours multiplied by a reasonable rate) represents a reasonable fee.[83] Currently prevailing marketplace rates establish the lodestar amount.[84] "The district court may not reduce the established market rate by some factor that it believes accounts for differences between large firms and small firms. Lawyers of common expertise and experience in the same market are entitled to the same rate."[85]

---

[78] *See Johnson v. Georgia Hwy. Exp., Inc.*, 488 F.2d 714, 717-19 (5th Cir. 1974), abrogated on other grounds by *Blanchard v. Bergeron*, 489 U.S. 87, 92–93 (1989).

[79] *Trimper v. City of Norfolk, Va.*, 846 F. Supp. 1295, 1303 (E.D. Va. 1994).

[80] *Hensley v. Eckerhart,* 461 U.S. 424, 433-34, 103 S.Ct. at 1939-40 (1983).

[81] *Id.* at 434 n.9, 103 S.Ct. at 1940 n. 9.

[82] *Daly v. Hill*, 790 F.2d 1071, 1078 (4th Cir. 1986).

[83] *Blanchard*, 489 U.S. at 95, quoting *Pennsylvania v. Delaware Valley Citizens' Council for Clean Air*, 478 U.S. 546, 656 (1986).

[84] *Missouri v. Jenkins by Agyei*, 491 U.S. 274, 283 (1989); *Blum v. Stenson*, 465 U.S. 886, 895 (1984); *DiFilippo v. Morizio*, 759 F.2d 231, 235 (2d Cir. 1985) (rejecting 46 hours on pretrial memo and 42 hours on fee application); *Cohen v. West Haven Bd. of Police Com'rs*, 638 F.2d 496, 506 (2d Cir. 1980).

[85] *Bankston v. State of Illinois*, 60 F.3d 1249, 1255-56 (7th Cir. 1995); *Bailey v. District of Columbia*, 839 F. Supp. 888, 891 (D.D.C. 1993) (no distinction between solo and large firm

District courts should not treat an attorney's status as a solo practitioner as grounds for an automatic reduction in the reasonable hourly rate. Cases suggest that in determining the relevant "market," a court may look to rates charged by those similarly situated, including looking to the rates charged by large- or medium-sized law firms.[86] But whether or not the aforementioned premise – that the bigger the firm the higher the attorneys' hourly rates charged – is correct, and even assuming that solo practitioners of equal skill, expertise and reputation, charge less than those at large- or medium-sized firms, courts should not automatically reduce the reasonable hourly rate based solely on an attorney's status as a solo practitioner. Overhead is not a valid reason for why certain attorneys should be awarded a higher or lower hourly rate.[87] Rather, overhead merely helps account for why some attorneys charge more for their services. Indeed, it may be that in certain niche practice areas, attorneys of the highest "skill, expertise, and reputation" have decided to maintain a solo practice instead of affiliating themselves with a firm. The reasons for doing so may be numerous, including the inherent problems of higher overhead, fee-sharing, and imputed conflicts of interest. The focus of the inquiry into the reasonable hourly rate must instead be determined by reference to "prevailing [rates] in the community for similar services by lawyers of reasonably comparable skill, expertise, and reputation." [88] Working as a

---

rate); *Gary v. Kason Credit Corp.*, No. 95-CV-54 (D. Conn. Oct. 21, 1998) (rejecting "overhead" argument).

[86] *See, e.g.*, *Chambless v Masters Mate & Masters Pension Plan*, 885 F.2d 1053, 1058-59 (2d 1989); *Algie v. RCA Global Commc'ns, Inc.*, 891 F. Supp. 875, 895 (S.D.N.Y. 1994).

[87] *Miele v. New York State Teamsters Conference Pension & Retirement Fund,* 831 F.2d 407, 409 (2d Cir. 1987); *Blum*, 465 U.S. at 895-96 (rejecting the Solicitor General's suggestion that fees awarded to non-profit legal aid societies be based on a "cost-related standard").

[88] *Blum*, 465 U.S. at 895, n.11; *Chambless*, 885 F.2d at 1058-59.

solo practitioner may be relevant to defining the market,[89] but it would be error to use an attorney's solo status as an automatic deduction or shortcut for determining the reasonable rate.[90]

While the Court has discretion to determine the proper fee, "the latitude of its discretion is narrowed by a presumption that successful [litigants] should recover reasonable attorney's fees unless special circumstances render such an award unjust. . . . Furthermore, where, as here, the party achieves success on the merits, an award of all reasonable hours at a reasonable hourly rate, *i.e.*, the lodestar figure, is presumptively appropriate."[91] "[A] party advocating the reduction of the lodestar amount bears the burden of establishing that a reduction is justified."[92]

### D.  Plaintiffs' attorneys' hourly rates are reasonable

The Fourth Circuit has held that "determination of the hourly rate will generally be the critical inquiry in setting the reasonable fee, and the burden rests with the fee applicant to establish the reasonableness of a requested rate. In addition to the attorney's own affidavits, the fee applicant must produce satisfactory specific evidence of the prevailing market rates in the relevant community for the type of work for which he seeks an award. Although the determination of a market rate in the legal profession is inherently problematic, as wide variations in skill and reputation render the usual laws of supply and demand largely

---

[89] *See Chambless*, 885 F.2d at 1059 ("smaller firms may be subject to their own prevailing market rate").

[90] *McDonald v. Pension Plan of the NYSA-ILA Pension Trust Fund*, 450 F.3d 91, 98 n.6 (2d Cir. 2006) (emphasis added).

[91] *DiFilippo*, 759 F.2d at 234 (discussing civil rights litigants).

[92] *United States Football League v. National Football League*, 887 F.2d 408, 413 (2d Cir. 1989) (awarding $5,500,000 in fees on $3 recovery), cited in *Grant v. Martinez*, 973 F.2d 96, 101 (2d Cir. 1992). *See* Laura B. Bartell, *Taxation of Costs and Awards of Expenses in Federal Court*, 101 F.R.D. 553, 560-62 (1984).

inapplicable, the Court has nonetheless emphasized that market rate should guide the fee inquiry."[93] "The market rate should be determined by evidence of what attorneys earn from paying clients for similar services in similar circumstances, which, of course, may include evidence of what the plaintiff's attorney actually charged his client."[94]

As set forth in the accompanying declarations from Class Counsel and from local attorneys who practice in this Courthouse, the requested rates of Class Counsel here – $550 an hour for Mr. Breeden, Mr. Bromberg, and Mr. Pittman, and $400 an hour for the associates – represent the prevailing rates in this Court. Because Leonard A. Bennett, Esq., has known all three attorneys for many years, he can testify not only to the prevailing rates for local attorneys handling complicated consumer class-action litigation, but through personal knowledge he can testify to the abilities and reputations of these attorneys. Craig Reilly, Esq. has submitted a declaration as to the local prevailing rates.

Mr. Edelman and Ms. Combs, and their associate, are in a peculiar position, having brought this case in a jurisdiction where their rates have been approved at $700 an hour or higher, and having had to agree to a transfer to resolve their case with the other two cases in Virginia. Class Counsel is of the opinion that their rates should be approved at the prevailing rates for attorneys of their experience in Chicago, *i.e.*, $700 an hour for Mr. Edelman and Ms. Combs, and $230 an hour for their associate.[95]

---

[93] *Plyler v. Evatt*, 902 F.2d 273, 277 (4th Cir. 1990) (internal quotation marks and citations omitted).

[94] *Depaoli v. Vacation Sales Assocs., L.L.C.*, 489 F.3d 615, 622 (4th Cir. 2007) (internal quotation marks and citation omitted).

[95] *See* Declarations of Daniel A. Edelman and David Philipps; *see also Rum Creek Coal Sales, Inc. v Caperton*, 31 F.3d 169, 179 (4th Cir. 1994).

### E.  Attorney fees incurred in connection with the fee petition are recoverable.

The Fourth Circuit has specifically held that attorney fees incurred pursuing a motion for an award of attorney fees is recoverable.[96] The time spent pursuing fees is to be awarded so that the fees awarded under a statute are not diminished.[97]

### F.  An upward adjustment should be made

The burden of proof is on the opponent to present specific evidence that a lower amount is appropriate.[98] Here, Plaintiffs' lodestar totals $500,483.70 and Plaintiffs' costs total $10,650.80. As detailed in the Declarations of Brian L. Bromberg, Thomas. R. Breeden, Dale W. Pittman, and Daniel A.  Edelman, this total includes 421.30 hours of Bromberg Law Office, P.C.'s time, at $550 an hour for Mr. Bromberg and $400 an hour for Mr. Bromberg's associate, 326.62 hours for Law Office of Thomas R. Breeden, P.C.'s time, at $550 an hour for Mr. Breeden and $220 an hour for Mr. Breeden's paralegal, 74.6 hours for Law Office of Dale Pittman's at $550 an hour for Mr. Pittman's time and $200 an hour for Karen Graham, Mr. Pittman's paralegal, and 134,10 hours for Edelman, Combs, Latturner & Goodwin, LLC's time, at $700 an hour for Mr. Edelman and Ms. Combs and $230 an hour for their associate, Michelle

---

[96] *Kerns v. Consolidated Coal Company*, 247 F.3d 131 (4th Cir. 2001); *Nigh v Koons Buick Pontiac GMC Incorporated*, 478 F.3d 183 (4th Cir. 2007) (awarding time incurred on fee petition, as well as time incurred unsuccessfully defending an appeal).

[97] *Daly v. Hill*, 790 F.2d 1071, 1080 (4th Cir. 1986); *Hymes v. Harnett County Bd. of Ed.*, 664 F.2d 410, 413 (4th Cir. 1981); *Spellan v. Board of Educ. For Dist. 111*, 69 F.3d 828, 829 (7th Cir. 1995); *Haitian Refugee Center v. Meese*, 791 F.2d 1489, 1500-01 (11th Cir. 1986); *Johnson v. State of Miss.*, 606 F.2d 635, 638 (5th Cir. 1979); *David v. City of Scranton*, 633 F.2d 676 (3d Cir. 1980).

[98] *See, e.g.*, *United States Football League*, 887 F.2d at 413; *Gates v. Deukmejian*, 987 F.2d 1392, 1397-98 (9th Cir. 1992) (fee opponent must submit evidence); *Brinker v. Giuffrida*, 798 F.2d 661, 668 (3d Cir. 1986) ("[T]here is ordinarily no reason for a court to disregard uncontested affidavits of a fee applicant").

A. Alyea. In addition, Plaintiffs' total costs to date are $10,650.80.  After considerable

negotiation, Plaintiffs agreed an award of attorney fees and costs up to one-third of the total

award to the class, or $900,000, subject to the Court's approval. Interest in the settlement has

been unexpectedly high and Mr. Bromberg and Mr. Breeden have received more calls from Class

Members regarding the Settlement than either of them can recall regarding any other

settlement.[99]

This case settled due to Plaintiffs' attorneys' knowledge and expertise in the field of

consumer-protection law. With the exception of Plaintiffs' attorneys, few law firms are regularly

prosecuting FDCPA cases to class certification. Many, if not most, such cases settle individually.

Large firms will not take class cases under the FDCPA because of the cap on statutory damages

and small firms rarely prosecute such cases effectively. Accordingly, Plaintiffs request a modest

multiplier of 1.5 for achieving extraordinary results.[100]

Moreover, under the adjustment factors identified in the Fifth Circuit case of *Johnson v.*

*Georgia Highway Express, Inc.*, the fees and costs agreed upon by the parties are fair and

reasonable.[101] And in reviewing the factors below and deciding whether to apply a multiplier,

---

[99] *See* Bromberg Decl.
[100] *Vizcaino v. Microsoft*, 290 F.3d 1043 (9th Cir. 2002) (surveying many decisions awarding multipliers and concluding that multipliers between 1 and 4 are the norm in common fund cases); *In re Cendent Corp. PRIDES Litig.*, 243 F.3d 722, 742 (3d Cir. 2001) ("'multiples ranging from one to four are frequently awarded in common fund cases when the lodestar method is applied.'"); *New England Carpenters Health Benefits Fund v. First Databank, Inc.*, No. 05-11148, 2009 WL 2408560, at *2 (D. Mass. Aug. 3, 2009) (approving multiplier of about 8.3 times lodestar, where attorney fees represented 20% of the common fund); *In re Beverly Hills Fire Litig.*, 639 F.Supp. 915 (E.D.Ky, 1986) (five); *In re Cenco Inc. Sec. Litig.*, 519 F.Supp. 322 (N.D.Ill. 1981) (multiplier of four to lead firm).
[101] *Johnson*, 488 F.2d at 717-719.

Class Counsel asks that Your Honor bear in mind just how rare and exceptional are the results obtained here: Plaintiffs have recovered more than five times the maximum statutory damages recovery available under the FDCPA.[102] Plaintiffs have found no reported decision in this District awarding anything near this sum in an FDCPA case. With these rare and exceptional results in mind, Plaintiffs now proceed to analyze the requested fees under the *Johnson* factors.

### 1. The time and labor required.

The Parties engaged in substantial discovery, motion practice, and negotiations before settling. Thus, as stated by the Fifth Circuit in *McGowan v. King, Inc.*,[103] a case decided under the Truth in Lending Act:

> The [consumer's] counsel did not inflate this small case into a large one; its protraction resulted from the stalwart defense. And although defendants are not required to yield an inch or pay a dime not due, they may by militant resistance increase the exertions required of their opponents and thus, if unsuccessful, be required to bear that cost.[104]

Plaintiffs submit that the time expended prosecuting this action is warranted given the full discovery, the extensive motion practice under Fed. R. Civ. P. 12 and 23, the completion of all written and deposition discovery, the protracted negotiations that resulted in a sizable settlement fund, which is five times the maximum statutory damages, and the hours that Mr. Bromberg and Mr. Breeden spent speaking with class members. Moreover, the time expended was modest under the circumstances due to counsel's experience in consumer-protection litigation.

---

[102] *Perdue*, 559 U.S. 542, 552, 130 S.Ct. 1662, 1673, 176 L.Ed.2d 494 ("enhancements may be awarded in 'rare' and 'exceptional' circumstances").
[103] *McGowan v. King, Inc.*, 661 F.2d 48 (5th Cir. 1981).
[104] *Id.* at 51.

With the exception of the Edelman Combs firm, Class Counsel hail from small firms, and they do the bulk of the work on their own. As one district court has noted:

> . . . attorneys, like plaintiff's counsel, operating either as solo practitioners or in small firms, often lack the resources to retain a large staff of junior lawyers who could handle (certain more clerically related) tasks more economically. Denying plaintiffs compensation for these tasks would unfairly punish plaintiffs and their counsel for not staffing this case as if they had the manpower of a major law firm.[105]

Therefore, the time spent by Plaintiffs' counsel to complete this litigation, as set forth in the attachments hereto, warrants upward adjustment of the lodestar. Furthermore, when almost 12,000 settlement checks are sent out, Class Counsel anticipates, based on past experience, that Mr. Bromberg will receive numerous inquiries from class members.

**2. The novelty and difficulty of the questions.**

The questions presented by this case were not routine. Although this Court has been presented with issues regarding alleged violations of the FDCPA in the past, the analysis of the analysis of the interplay between the FDCPA and the regulations governing student loan garnishments, as well as the analysis of the pre-garnishment notice to determine the violations alleged, required an investment of time by Plaintiffs' counsel. Moreover, the issues presented to the Court have not been litigated before. Therefore, the novelty and difficulty of the issues provide no basis to adjust the lodestar downward, but does provide a basis for adjusting it

---

[105]*Bailey v. District of Columbia*, 839 F. Supp. 888, 891 (D.D.C. 1993); *see also*, *Withers v. Eveland*, 997 F. Supp. at 740, and *Morgan v. Credit Adjustment Board*, 1998 U.S. Dist. Lexis 8135 at 5.

33

upwards.  Even if the case had been entirely straightforward, the lodestar amount may not be reduced.[106]

### 3. The skill requisite to perform the legal services properly.

Successful litigation of FDCPA class actions requires skill and familiarity with the issues involved. Plaintiffs' counsel knows of very few attorneys who purport to be able to litigate plaintiffs' consumer-protection cases on a class-wide basis. Most attorneys do not recognize the legal issues involved in such cases, and requests for representation are generally turned away by members of the Bar. Because of the skill of Plaintiffs' counsel and the rarity of successfully prosecuting FDCPA class actions in this district, Plaintiffs request an upward adjustment of the lodestar.

### 4. The preclusion of other employment.

The time spent on this case was not, and could not be, spent at the same time on other cases. There are substantial opportunity costs in preparing the necessary documentation and briefing to represent plaintiffs in a contingency or fee-shifting case in federal court. The substantial amount of time expended on Plaintiffs' behalf was time which would have been spent on other matters, had this case not been filed or litigated to this extent.

Therefore, it is appropriate to consider that whenever an attorney takes a case, he or she does so to the exclusion of accepting other work. Plaintiffs' counsel expended the requisite amount of time reviewing the case and litigating it to its conclusion, to the exclusion of helping other consumers. Thus, some consumers did not receive counsel's help so that Mr. Biber, Ms. Levy, and Mr. Kozak could. Because the time spent on this case would have been expended on

---

[106] *DiFilippo v. Morizio*, 759 F.2d 231, 235 (2d Cir. 1985).

other matters, this factor provides a basis for an upward adjustment of the lodestar.

**5. The customary fee for like work in the community.**

Plaintiffs' fee request is well within the range of similar work and is an amount recognized by other courts. The fee is thus reasonable and the going rate for like work in this area. But the involvement of Plaintiffs' counsel in this case undoubtedly is the primary factor that led to settlement on a class basis. Therefore, Plaintiffs request an upward adjustment of the lodestar. This *Johnson* factor is addressed in greater detail below.

**6. Whether the fee is fixed or contingent.**

An award of attorney fees in a contingency fee matter should compensate counsel for the risk of receiving no compensation. In consumer-protection cases, the fee is very often contingent – not on the amount of damages, but on an award by the court or agreement by the opponent. In a private attorney general case, Congress encourages counsel to bring suit, recognizing that counsel cannot charge the client an hourly fee, because the fee may be out of proportion to the recovery. If contingent, the fee award should compensate counsel for the risk of receiving no compensation. "Lawyers operating in the marketplace can be expected to charge a higher hourly rate when their compensation is contingent on success than when they will be promptly paid, win or lose." [107] For example, Mr. Bromberg was also involved in the FDCPA case entitled *Lemire v. Wolpoff & Abramson, P.C.* [108] There the plaintiffs settled the case after prevailing on a disputed motion to certify the class. The settlement provided for a negotiated attorney fee of $53,000. Notwithstanding the successful work performed in that case, the defendant dissolved, making

---

[107] *Blum v. Stenson*, 465 U.S. 886, 903, 104 S.Ct. 1541, 1551, 79 L.Ed.2d 891 (1984).
[108] *Lemire v. Wolpoff & Abramson, P.C.*, D. Conn., Docket No. 08-cv-249(CSH).

35

collection of the settlement amount impracticable, and necessitating decertification.

Regarding this *Johnson* factor, whether the fee is fixed or contingent, a Fourth Circuit opinion examining the contingency fee arrangement speaks to the importance of the contingent nature of fees in consumer cases and the need to maintain those fees at the highest reasonable market rate applicable. In *In re Abrams & Abrams, P.A.*, the Fourth Circuit held that "As an initial matter, contingency fees provide access to counsel for individuals who would otherwise have difficulty obtaining representation. Sadly, a plaintiff sometimes has little to offer a lawyer other than his personal plight."[109] The availability of an award of reasonable fees is doubly important in Consumer Credit Protection Act matters, such as Fair Debt Collections Practices Act and Fair Credit Reporting Act cases, where successful statutory damage awards may be limited to $1000.00 and actual damages may be de minimis, nonexistent or limited, as the Fourth Circuit noted in *Yohay v. City of Alexandria Employees Credit Union*.[110] The same rationale that the Fourth Circuit so emphatically embraced in *Abrams* with respect to percentage contingency fee arrangements applies with equal force to court awarded statutory attorney fees in consumer protection cases. "Ignoring reasonable contingent fee arrangements or automatically reducing them would impair claimants' ability to secure representation."[111] "The point remains that contingency fees are an acknowledged feature of our legal landscape, approved by legislative

---

[109] *In re Abrams & Abrams, P.A.*, 605 F.3d 238, 245 (4th Cir. 2010).
[110] *Yohay v. City of Alexandria Employees Credit Union*, 827 F.2d 967, 974 (4th Cir. 1987) (Proportionality of attorney fees to the amount recovered is not required in every action brought pursuant to the FCRA. Since there will rarely be extensive damages in an FCRA action, requiring that attorney fees be proportionate to the amount recovered would discourage vigorous enforcement of the Act.)
[111] *In re Abrams & Abrams*, 605 F.3d at 245 (citing *Wells v. Sullivan*, 907 F.2d 367, 371 (2d Cir. 1990)).

and judicial bodies alike, that help secure for the impecunious access both to counsel and to court."[112] Plaintiffs' counsel was willing to provide services to the named plaintiffs and members of the class whether they win or lose the case and whether or not counsel got paid for that work. This *Johnson* factor provides no basis here for any change in the lodestar amount, but provides ample support for approval of a lodestar amount at the high end of market compensation for legal counsel. "Successful outcomes often make risks seem less risky in hindsight than they were at the time, and the court should not have ignored those risks merely because at some later point in litigation the defendant found it in its interest to settle."[113]

Class Counsel was willing to provide services to Plaintiffs whether they won or lost their cases and whether or not counsel would receive compensation for that work. This factor justifies an upward adjustment of the lodestar.

### 7. Time limitations imposed by the client or the circumstances.

The time limits here were imposed by the applicable statutes of limitations, the Rules, and those set by the Court. Because this case is in the fastest federal-court docket in the country, Class Counsel had to perform a considerable amount of work in a short period of time. For example, in many courts, discovery would have been stayed while the parties briefed Pioneer's motion to dismiss, but here, all discovery was completed shortly before the parties even argued the motion to dismiss. Therefore, this *Johnson* factor warrants and upward adjustment.

### 8. The amount involved and the results obtained.

The results obtained for the Plaintiffs were significant, and they reflect counsel's

---

[112] *Id.*
[113] *Id.*, at 248.

substantial efforts in preparing and litigating this matter. Plaintiffs have obtained a monetary recovery that represents more than five times the maximum recovery. By any calculation, this is an extraordinary result, warranting an upward adjustment of the lodestar. Moreover, when confronted with the thorny problem of fairly and efficiently distributing potentially millions of dollars to thousands of class members, some plaintiffs' counsel might simply have acceded to a wholly *cy pres* settlement; Plaintiffs' counsel, however, persevered to negotiate and construct a settlement plan that aimed to return significant amounts of money to individual class members on a claims-made basis.

### 9. The experience, reputation and ability of the attorney.

One of Plaintiffs' attorneys, Brian L. Bromberg, has been practicing for 26 years, is admitted in New York, New Jersey, and California, and has established a strong reputation as a consumer-protection attorney.[114] Although Mr. Bromberg's former associate, Jonathan R. Miller, has only been admitted for six years, he attended Harvard Law School, clerked for the chief judge of the Missouri Supreme Court, and is admitted in New York, Missouri, and North Carolina. Plaintiffs' attorneys in Virginia, Thomas R. Breeden and Dale W. Pittman, have been practicing law for 26 years and 41 years, respectively, are both admitted in Virginia, and have established reputations as consumer-protection attorneys.[115] (It would not be overstating matters to refer to Mr. Pittman as the "godfather" of consumer law in Virginia.) Best known of all are Daniel Edelman and Cathleen Combs, whose firm has probably resolved more FDCPA cases on

---

[114] *See* Declaration of Brian L. Bromberg.
[115] *See* Declarations of Thomas R. Breeden and Dale W. Pittman.

a class-wide basis than any other lawyers in the country. These factors warrant an upward adjustment of the lodestar.

### 10. The undesirability of the case.

There are very few attorneys who have the knowledge, ability, and willingness to represent consumers in this area of law. Most attorneys are unwilling to take the risk of large investments of time for what appear at first blush to be minor, small dollar cases. Very few attorneys regularly prosecute FDCPA cases to conclusion as class actions. Searches on Westlaw and PACER will reveal that a substantial number of successful certifications of a class under the FDCPA have involved Mr. Bromberg, Mr. Edelman, or Ms. Combs as class counsel. Many other attorneys will file such cases as class actions, but few push them to certification. (Plaintiffs' attorneys are also willing to push cases beyond the district-court level, frequently taking cases up on appeal.) Accordingly, this factor, too, warrants an upward modification of the lodestar.

### 11. The nature and length of the professional relationship with the client.

Mr. Biber, Ms. Levy, and Mr. Kozak retained their attorneys specifically to pursue the specialized consumer-protection laws at issue. Plaintiffs sought them out because of their legal abilities and reputations in this area of the law. Such representation is limited to consumer-protection claims, which are episodic rather than ongoing. Unlike their big-firm brethren, consumer attorneys cannot rely on hefty retainers from paying institutional clients or insurance companies over many years. Therefore, this *Johnson* factor warrants an upward modification.

### 12. Awards in similar cases.

There are few reported cases in Virginia discussing attorney fee awards in FDCPA class actions. Courts recognize that fee awards are to mimic the marketplace. Thus, "[p]aying counsel

in FDCPA cases at rates lower than those they can obtain in the marketplace is inconsistent with the congressional desire to enforce the FDCPA through private actions, and therefore misapplies the law."[116] In any event, the results achieved here warrant an upward modification of the lodestar.

**Conclusion**

The Parties have reached a Settlement in this case that provides a genuine benefit to the Class Members. The Settlement is an excellent result considering the size of the class and the cap on total possible recovery. Each Class Member who sent in a claim form will receive a substantial recover of $170.70 (if he or she certified as to work status) or $85.35 (without a work-status certification). In addition, the terms of the Settlement as well as the circumstances surrounding negotiations and its elimination of further costs caused by litigating this case through trial and appeal satisfy the Fourth Circuit's strictures for final approval. Accordingly, Plaintiffs ask the Court for an Order approving the Settlement and Class Counsel's request for attorney fees and costs.

Dated: December 21, 2017

> PLAINTIFFS, ATTILLA BIBER, SANDRA LEVY, AND SARA KOZAK, Individually, And On Behalf Of the Class,
>
> By: /s/ Thomas R. Breeden
> Thomas R Breeden

---

[116] *Tolentino v. Friedman*, 46 F.3d 645, 653 (7th Cir. 1995); *Zagorski v. Midwest Billing Services, Inc.*, 128 F.3d 1164 (7th Cir. 1997).

**Certificate of Service**

I hereby certify that on this December 21, 2017, a copy of the foregoing Memorandum of Law in Support of Motion for Final Approval was filed electronically and served by mail on anyone unable to accept electronic filing.  Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing.  Parties may access this filing through the Court's CM/ECF System.

Dated: December 21, 2017

/s/ Thomas Breeden
Thomas Breeden

41